**Harold WEISBERG, Plaintiff,**

v.

**U. S. DEPARTMENT OF JUSTICE et al., Defendants.**

**Civ. A. No. 77-226.**

United States District Court, District of Columbia, Civil Division.

Oct. 5, 1977.

---

James Hiram Lesar, Washington, D. C., for plaintiff.

Michael J. Ryan, Asst. U.S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter is before the Court on defendants' motion for summary judgment. Plaintiff has brought suit under the Freedom of Information Act ("FOIA") to obtain materials relating to scientific and ballistics tests alleged to have been performed on items of evidence in the assassination of President John F. Kennedy. 5 U.S.C. § 552(b)(7) (Supp. V 1975). The defendants are the United States Department of Justice, to which plaintiff has directed his requests for laboratory records of the Federal Bureau of Investigation, and the United States Energy Research and Development Administration ("ERDA"), to which plaintiff has directed requests for records of the Atomic Energy Commission ("AEC"), ERDA's predecessor agency.[1]

---

1. ERDA's responses to plaintiff's interrogatories indicate that the AEC's role in the investigation of the assassination of President Kennedy was limited to making its reactor facilities at Oak Ridge, Tennessee, available for FBI tests on assassination evidence. *See generally* Defendant ERDA's Responses to Plaintiff's First Set of Interrogatories. Plaintiff apparently does not dispute this point; the only respect in which either ERDA or AEC figure in his recent submissions relates to the FBI's alleged failure to follow up on an AEC official's recommendations that certain tests be conducted. *See* Affidavit of Harold Weisberg, at 16; Letter from Dr. Paul C. Aebersold, Director, Division of Isotopes Development, United States Atomic Energy Commission, to Herbert J. Miller, Assistant Attorney General, Criminal Division, United States Department of Justice (December 11, 1963). The AEC recommendations were conveyed to the FBI by counsel for the President's Commission on the Assassination of President Kennedy (Warren Commission). Letter from J. Lee Rankin, General Counsel, President's Commission on the Assassination of President Kennedy, to J. Edgar Hoover, Director, Federal Bureau of Investigation, (January 7, 1964). In its reply, the FBI pointed out that it was already "well-acquainted" with the techniques propounded by the AEC, and that arrangements for such testing already were under way. Letter from J. Edgar Hoover to J. Lee Rankin (January 10, 1964). There is no indication that the FBI followed the AEC recommendations to the letter; indeed, the FBI special agent who conducted the type of testing in question appears to have resented the AEC recommendation as interfering in the FBI's investigation. *See* Deposition of John F. Gallagher, at 67–69.

Although the Government's submissions to the plaintiff have been voluminous, plaintiff maintains that much of what he has received was unsought, and that much of what he has sought has not been tendered to him. The Government's position, on the other hand, remains, first, that it has complied fully with plaintiff's requests as to materials extant, and second, that it cannot possibly comply with the remaining requests because the materials sought do not exist.

In moving for summary judgment, the Government bears the burden of demonstrating that no genuine issue of material fact impedes its right to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973). Although mere assertions in the pleadings will not suffice to defeat a motion for summary judgment, *Dewey v. Clark,* 86 U.S.App.D.C. 137, 141, 180 F.2d 766, 770 (1950), matters of fact are to be viewed in the light most favorable to the party opposing the motion. *Nyhus v. Travel Management Corp.,* 151 U.S.App. D.C. 269, 271, 466 F.2d 440, 442 (1972); *Semaan v. Mumford,* 118 U.S.App.D.C. 282, 283, 335 F.2d 704, 705 n. 2 (1964).

## I. *BACKGROUND OF THE ACTION.*

Plaintiff's initial quest for scientific investigatory data related to the assassination of President Kennedy was frustrated in the courts on the ground that the data sought lay within the purview of FOIA exemption seven, covering investigative matter. *Weisberg v. United States Department of Justice,* 160 U.S.App.D.C. 71, 489 F.2d 1195 (1973) (en banc), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *see* Act of June 5, 1967, Pub.L.No.90–23, § 1, 81 Stat. 54 (current version of 5 U.S.C. § 552(b)(7) (Supp. V 1975)). Congress subsequently narrowed the scope of exemption seven, and plaintiff renewed his requests. Act of Nov. 21, 1974, Pub.L.No.93–502, § 2, 88 Stat. 1563, *amending* 5 U.S.C. § 552(b)(7) (1970). On July 15, 1975, this Court dismissed the action as moot, and plaintiff took an appeal. A panel of the United States Court of Appeals for the District of Columbia Circuit reversed, and remanded for further proceedings. *Weisberg v. United States Department of Justice,* 177 U.S. App.D.C. 161, 543 F.2d 308 (1976). The Court of Appeals identified five categories of investigative tests as to which plaintiff had made demands "which raise material factual questions still in dispute." *Id.* at 163, 543 F.2d at 310. As the Court of Appeals noted, however, there remain other categories of tests, such as the microscopic examinations performed on certain items of evidence, as to which plaintiff asserts his requests have not evoked satisfactory response. *Id.* at 164, 543 F.2d at 311. These categories, as well as the five enumerated in in the Court of Appeals opinion, must figure in consideration of the motion for summary judgment. In addition to identifying several of the factual areas to be explored on remand, the Court of Appeals specified an exploratory technique, namely the taking of the testimony, by deposition or otherwise, with an opportunity for cross-examination in any case, of the individuals who actually conducted the tests, the results of which plaintiff has requested. *Id.* at 163, 164, 543 F.2d at 310, 311.

In February and March, 1977, plaintiff took the depositions of four former and present employees of the Federal Bureau of Investigation laboratory, all of whom worked directly with evidence associated with the assassination. The four are Robert A. Frazier, employed as a special agent in the laboratory's firearms and toolmarks unit during the investigation of the assassination, and retired from the FBI as of April 1975; John F. Gallagher, assigned to the laboratory's spectrographic unit during the investigation, and retired as of January 1975; Lyndal L. Shaneyfelt, assigned as a documents examiner and photographic specialists for the laboratory between 1955 and 1975, when he retired from the Bureau; and Cortlandt Cunningham, formerly a special agent supervisor in the firearms and toolmarks unit during the investigation, and presently chief of the unit. Frazier and Cunningham were deposed February 24, 1977, and Gallagher and Shaneyfelt

were deposed March 28, 1977. At each deposition save that of former Special Agent Gallagher, examination was by plaintiff's counsel only, with occasionally interposed objections from counsel for the defendants. At a hearing March 30, 1977, counsel for plaintiff indicated that no further depositions of FBI employees who had participated in the Bureau's investigation were planned.[2] *Weisberg v. United States Department of Justice,* No. 75–226, Tr. at 4 (D.D.C. March 30, 1977). These representations controvert the suggestion in an affidavit of the plaintiff that "[t]his Court refused me the depositions my counsel and I consider necessary to meet what I regard as the mandate of the court of appeals . . ." Affidavit of Harold Weisberg ¶ 165, at 34 (July 28, 1977) [hereinafter "Weisberg Affidavit"]. Read broadly, the mandate of the Court of Appeals was to resolve whether the data sought exist on "the basis of the best available evidence, *i. e.,* the witnesses who had personal knowledge of events at the time the investigation was made." 177 U.S.App.D.C. at 164, 543 F.2d at 311. Plaintiff has not sought to depose any such witness other than the four whose depositions were taken. To borrow the metaphor employed by the Court of Appeals in its opinion above, the legal engine of cross-examination has done its work on plaintiff's behalf with respect to witnesses with direct knowledge of the FBI investigation into the President's assassination. 177 U.S.App.D.C. at 164, 543 F.2d at 311. The issue devolves to what the evidence adduced in the four depositions establishes, and thence to whether there now remains a genuine issue as to whether the Government has complied with the strictures of the FOIA.

## II.  *THE EVIDENCE ADDUCED.*

The testimony of all four deponents related not only to specific pieces of assassination evidence and the tests performed, or not performed, upon them, but also to the procedures, and occasionally lack of procedures, employed in those sections of the FBI laboratory with which the deponents were familiar. These laboratory procedures bear significantly on the question whether much of the material plaintiff seeks exists.

*Laboratory Procedures.* The laboratory's Scientific Analysis Section, was known at the time of the investigation as the Physics and Chemistry Section; then, as now, the section comprised several disparate units, including the firearms and toolmarks unit, and the spectrographic unit, which in 1963–64 was responsible for both emissions spectrography and neutron activation analysis. Cunningham Deposition, at 4–5. During the investigation of the Presidential assassination, investigating agencies in the field— the Dallas Police Department, the Secret Service, and the FBI—forwarded the evidence to the FBI laboratory, in some instances directly to the firearms and toolmarks unit. Frazier Deposition, at 5, 7–8; Cunningham Deposition, at 8. Ordinarily, the evidence would be accompanied by a statement of the matters sought to be ascertained through laboratory testing, as, for example, the presence of gunpowder on a piece of evidence. Frazier Deposition, at 6, 8. The decision as to the specific tests to be conducted, however, was made within the laboratory. *Id.* at 8–9; Cunningham Deposition, at 8–9; Gallagher Deposition, at 26–27. The decisionmaking process as to which tests would be appropriate apparently was highly informal: in some cases, Frazier, the laboratory examiner with direct responsibility for the Physics and Chemistry Section's efforts in the investigation, conferred with his superiors on the tests to be performed, Cunningham Deposition, at 8–9, and in others, he and the individual examiners who would conduct the tests conferred on which tests to perform. Frazier Deposition, at 8; Gallagher Deposition, at 27. In still other instances, if the individual examiner determined that tests outside his domain were called for, he and his supervisor (Frazier, in

---

2.  Counsel had previously indicated he planned to depose plaintiff, an employee of the National Archives, which has custody of the evidence involved, and an FBI special agent who had not participated in the investigation but whose affidavit had constituted part of the Government's response to plaintiff's request.

most cases) would approach examiners in the other units with jurisdiction over the requisite type of testing. Cunningham Deposition, at 10; Frazier Deposition, at 8–9; Shaneyfelt Deposition, at 14. Only rarely were these conferences on tests to be performed recorded in communications between the conferees, or in notes made by one of them. Cunningham Deposition, at 10; Frazier Deposition, at 8–9; Gallagher Deposition, at 27–28.

The tests determined to be appropriate for a given item of physical evidence typically were conducted by examiners working individually, or under the direct supervision of the individual examiner. Cunningham Deposition, at 10; Frazier Deposition, at 10. Three examiners in the firearms and toolmarks unit collaborated on the testing within that unit, all three having been present during all tests conducted by the unit on assassination evidence, save a velocity test. Cunningham Deposition, at 53. Several examiners tested items of evidence in the spectrography unit, although they appear to have worked separately. Gallagher Deposition, at 7, 35–37.

Just as there was no established procedure for deciding which tests were to be performed on a particular item of evidence, there was no requirement that test results be expressed in a particular format, or expressed at all if the results were insignificant. In most instances, the examiner performing a test took notes during the testing. Cunningham Deposition, at 11; Frazier Deposition, at 10; Gallagher Deposition, at 38. However, all deponents testified to not having made notes on results they deemed insignificant or insufficiently reliable. Cunningham, for example, testified to his practice of making notes on a weapon's operating condition only if the weapon was not in normal working order. Cunningham Deposition, at 21. Gallagher explained the absence of observation data in a neutron activation analysis folder by suggesting that he might have skipped the step of noting down the readings and done the tabulations in his head. Gallagher Deposition, at 61–62. He indicated later that he did not report a thirty percent variation in

primer residue data between shells because he did not consider the variation significant. Id. at 114. Shaneyfelt testified that he had not submitted a report on the four frames allegedly spliced out of the Zapruder film of the assassination because the film print from which he had worked was complete. Shaneyfelt Deposition, at 21.

What an examiner did with test results likewise varied. In many instances, the examiner dictated a report on the tests conducted, either for use on its own or for incorporation in a more comprehensive report prepared by the examiner's superior. Frazier Deposition, at 11; Gallagher Deposition, at 38. Gallagher, however, indicated that he occasionally submitted data directly to Special Agent Frazier who transmuted the figures into prose. Gallagher Deposition, at 38. When the examiner himself prepared the report, he did not always include in it all the results obtained, as when the testing was done for "background purposes," Gallagher Deposition, at 57; when flaws in the testing itself cast the results in doubt, see id. at 71, or when the results would simply not be of value, in the examiner's judgment. Cunningham Deposition, at 47. In some instances, the examiner's failure to make a report is unexplained. See Cunningham Deposition, at 33, 53; Gallagher Deposition, at 73–74.

After the report was prepared, one copy went into FBI files, another went to the "original contributor" of the item of evidence on which the report was based (generally the FBI's Dallas field office), and a third went to the examiner or examiners responsible, for them to retain informally with their notes of the tests. Cunningham Deposition, at 11–12, 17; Frazier Deposition, at 12, 15; Gallagher Deposition, at 86–87. Whether the Warren Commission received the actual reports, and how the reports the Commission received were transmitted, varied widely. Former Special Agent Frazier recalled the "mechanics" of the process as being, first, that the laboratory forwarded the report to the Dallas field office; next, that the Dallas office incorporated the report into its report to

the Commission, and finally, that the latter report was transmitted to the Commission. Frazier Deposition, at 19–20. In practice, however, there appears to have been substantial, continuing and direct contact between laboratory personnel and the Commission. Cunningham Deposition, at 49–50; Frazier Deposition, at 20–21; Shaneyfelt Deposition, at 8. Frazier indicated that several laboratory employees, whose identities he could not recall, served as liaison between the laboratory and the Commission. Frazier Deposition, at 20. Cunningham stated that he "generated some correspondence" with the Commission every day during the laboratory's participation in the investigation. Cunningham Deposition, at 51. Shaneyfelt indicated that his reports went to the Commission via his section chief, and that he testified to the Commission, either live or by deposition, on all examinations he conducted. Shaneyfelt Deposition, at 8–9. In his affidavit of May 13, 1965, John W. Kilty, special agent assigned to the FBI laboratory in a supervisory capacity, stated that plaintiff had been told that all final FBI laboratory reports in the pertinent categories of testing had been furnished to the Commission. However, there apparently was no monitoring system known to deponents to log the transfer of final reports to the Commission, and no custodian within the laboratory to collect final laboratory reports. Frazier Deposition, at 68. It is clear, on the other hand, that not all examiners' observation notes went to the Commission, the rule being that examiners retained their notes except when the supervisor prepared a report directly from the notes. Cunningham Deposition, at 47, 52–53; Frazier Deposition, at 15; see Gallagher Deposition, at 73, 107. One instance of the latter occurred when Frazier used Gallagher's worksheets to prepare a report on testing of a bullet fragment; both the worksheets and the report went to the Commission, though only Frazier appeared before the Commission. Frazier Deposition, at 42–44; Gallagher Deposition,

at 82, 84. Finally, neither observation notes, worksheets, nor final reports were distributed among units within the laboratory, absent a specific reason. Cunningham Deposition, at 12–13; Frazier Deposition, at 15, 18. Former Special Agent Gallagher testified that even within the spectrographic unit one examiner's report on testing would not necessarily, or even customarily, have been circulated among the other examiners in the same unit. Gallagher Deposition, at 7–8. An examiner who performed tests on a particular item of evidence thus might be unaware whether other units within the laboratory had performed other tests on the same item. *E. g.* Cunningham Deposition, at 22–23; Gallagher Deposition, at 6–7, 26; Shaneyfelt Deposition, at 16.

*Tests Performed on Assassination Evidence.* The Court of Appeals opinion remanding this case for further consideration and testimony adverts to five areas of continuing factual dispute [177 U.S.App.D.C. at 163–64, 543 F.2d at 310–11]:

(1) Final reports of spectrographic analyses;

(2) Reports on neutron activation analyses of bullet fragments;

(3) Raw data of spectrographic and neutron activation analysis tests;

(4) Neutron activation analysis of clothing; and

(5) Emissions spectroscopy data and reports.[3]

Plaintiff's opposition to the motion for summary judgment identifies nine specific areas of testing, encompassed within the five areas enumerated by the Court of Appeals, in which plaintiff asserts the evidence shows tests should have been, or were, conducted, yet concerning which plaintiff has received no materials. These areas are:

(1) Neutron activation analysis of clothing, Opp., at 7–8;

(2) Neutron activation analysis of windshield scrapings, Opp., at 8–9;

---

**3.** The distinction between spectroscopic analysis and spectrographic analysis was not observed in deposition testimony and the plead-

ings. Hence, discussion of spectrography herein should be deemed to encompass spectroscopy where appropriate.

(3) Neutron activation analysis of Q3, a bullet fragment discovered beside the right front seat of the Presidential limousine, Opp., at 9;

(4) Print-outs for neutron activation analysis of Q3 and other specimens, Opp., at 9;

(5) Testing of the live round found chambered in the Mannlicher-Carcano rifle determined to have been the murder weapon, and comparison of said live round with shells found at the scene, Opp., at 9–10;

(6) Spectrographic testing of the curbstone supposed to have been struck by a bullet, a bullet fragment or fragments, or other airborne debris during the moments of the assassination, Opp., at 10;

(7) Testing of the bullet holes below the collar button of the shirt President Kennedy was wearing when he was shot, Opp., at 10;

(8) A "formal report" prepared by Frazier on the basis of Gallagher's comparison of windshield scrapings with other bullet matter, and alluded to in an exchange between Commission counsel and Frazier during Frazier's testimony before the Commission, Opp., at 10–11; and

(9) Report on neutron activation testing, Opp., at 11.[4]

As these differently organized catalogs of potential factual issues indicate, there are numerous ways of approaching the factual aspects of this case for the purpose of determining whether they engender issues of sufficient magnitude to defeat the motion for summary judgment. What follows is an amalgam or combination of the Court of Appeals' and plaintiff's approaches, in that this discussion commences with general observations on firearms testing, spectrography, and neutron activation analysis, with particular emphasis on each technique's capabilities and limitations, and proceeds to consideration of testing on specific items of evidence. It should be stressed that the question throughout is not whether tests ought to have been made, or even whether tests that actually were made should have culminated in the preparation of reports, but simply whether there is any genuine issue as to the existence of the reports and other materials plaintiff Weisberg seeks.

*Firearms Identification.* Special Agent Cunningham's work with the firearms and toolmarks unit of the laboratory's Scientific Analysis Section has included the examination of firearms and bullets to determine the source of particular bullets. Cunningham testified that the process commences with the marking, weighing, and identification of the slug as to type and characteristics. Cunningham Deposition, at 18–19. The bullet is examined microscopically for rifling marks that might be useful for purposes of identifying the source of the bullet. *Id.* at 19–20. If a weapon believed to be the source of the bullet is on hand, as was the Mannlicher-Carcano rifle in the Presidential assassination, it, too, is examined. *Id.* at 20–22. The examiner then fires the weapon using ammunition as similar as possible to the bullet under analysis. *Id.* at 25. The "evidence bullet" and the test bullet then are viewed simultaneously under a comparison microscope. *Id.* Any of three conclusions is possible: identification, indicating that the bullet under study was fired from the weapon in question, and no other; non-identification, indicating that the general rifling characteristics of the two bullets

4. Plaintiff does not indicate which item of evidence is the subject of the allegedly extant report; the reference will be construed hereafter as applying both to the windshield residues discussed in the preceding paragraph of the Opposition, and to the body of assassination evidence as a whole.

vary to the degree sufficient to exclude the weapon as the source of the bullet under analysis; and "no conclusion," indicating that the general characteristics are similar, but that the individual markings are either different or lacking. *Id.* at 26–27.

*Spectrography.* Former Special Agent Gallagher was a specialist in both spectrographic examination and neutron activation analysis. In spectrographic analysis, samples are either sparked or burned; the results show up on spectrographic plates from which the examiner derives composition data. Gallagher Deposition, at 37–38. Spectrographic examination will elicit information on a range of elements, though specific readings in multiple tests of the same item of evidence may vary as a consequence of the technique's relative insensitivity, inherent testing error, and compositional differences between different portions of the object under analysis. *Id.* at 41–42, 54, 58–60. Although less sensitive than neutron activation analysis, spectrographic testing appears to have been much more abundantly used in the examination of evidence, apparently because of the limitations inherent in neutron activation analysis.

*Neutron Activation Analysis.* In 1964, during the neutron activation analysis conducted in connection with the investigation into the assassination of President Kennedy, neutron activation analysis was relatively in an infant state, particularly so far as the equipment was concerned. *Id.* at 115. Even so, it was a far more sensitive technique for measuring the presence of certain elements in samples than spectrography: it was about twice as sensitive with respect to antimony, barium and other elements present in items of the assassination evidence, and up to a thousand times as sensitive with respect to other elements. *Id.* at 116. Its limitations, however, precluded its use on many items of assassination evidence, and vitiated the results of some tests that were performed on items. *Id.* at 50–

51, 92. One such limitation was that only a handful of elements were discernible through neutron activation analysis. *Id.* at 42. Another was that certain elements, such as sodium and copper, showed up so prominently in neutron activation analysis results as to obscure others. *Id.* at 51, 74. Thus, items of evidence composed largely of copper, such as copper bullet jackets, were not subjected to neutron activation analysis. *Id.* at 74–75, 97, 98–99. By the same token, however, lead does not show up in neutron activation analysis. *Id.* at 109.

On behalf of the FBI laboratory, Gallagher conducted neutron activation analysis on items of assassination evidence at the reactor at Oak Ridge National Laboratory in Tennessee. Gallagher Deposition, at 64. The paraffin lifts taken from Lee Harvey Oswald were tested shortly after the assassination, but other items were not tested at Oak Ridge until May 1964. *Id.* at 63, 65. When plaintiff's counsel asked him to explain the delay with respect to other items, Gallagher pointed out that the FBI's access to the reactor was limited, and that the paraffin lifts were tested early because they were tested solely by neutron activation analysis, whereas bullet samples could be tested by spectrography as well. *Id.* at 65.

Two additional observations on both spectrographic examination and neutron activation analysis should be made in response to points raised in plaintiff Weisberg's affidavit. First, plaintiff asserts that none of the reports he has been furnished alludes to microscopic examination, which both Cunningham and Gallagher testified they frequently conducted. Weisberg Affidavit, at 32; Cunningham Deposition, 18–19; Gallagher Deposition, at 31. Gallagher's explanation was that microscopic examination, at least within the FBI laboratory, is so widely accepted as a preliminary to spectrographic and other tests as not to be worth noting in a report. Gallagher Deposition, at 107. That, in plaintiff's words, "there is not a word in a single report" about microscopic

examination is entirely consistent with Gallagher's statement that FBI laboratory practice was to omit reference to microscopic examination. The second point raised by plaintiff is that the FBI laboratory reports contain "no statement of positive proof in the comparisons" of different items of evidence; "[t]here is only the meaningless description of 'similar.' " Weisberg Affidavit, at 8. Here, too, the deposition testimony reveals the plaintiff to be under a misapprehension, stemming from ignorance not of FBI laboratory practice in this instance, but of the inherent limitations of FBI examination techniques. Even neutron activation analysis, a much more sophisticated technique than spectrography, frequently will not enable bullet fragments, for example, to be positively identified as having come from a particular bullet. Cunningham Deposition, at 45–48; Gallagher Deposition, at 97–98. Neither will it be possible in many instances to exclude a fragment as having come from a given bullet, as when compositional variances are not sufficiently great to indicate different sources rather than fluctuations in composition within the bullet. Gallagher Deposition, at 102–05.

*CE # 399: The "Pristine Bullet."* The Warren Commission concluded that Commission Exhibit 399, one of the bullets fired at the Presidential motorcade that day, had passed through the President's neck, and struck successively Governor Connally's chest, wrist, and thigh, ending its journey without substantial visible damage to itself. Plaintiff's counsel directed numerous questions to both Cunningham and Frazier on how the slug could have inflicted so much damage without itself sustaining damage. Cunningham Deposition, at 34–37; Frazier Deposition, at 24–28, 31–33. Although plaintiff's line of questioning is, at best, doubtfully relevant to the question whether plaintiff has received all material on CE 399, plaintiff has devoted considerable discussion to the physical state of CE 399. Weisberg Affidavit, at 44–48. Cunningham was asked whether he would expect a bullet alleged to have inflicted the damage attrib-

uted to CE 399 to emerge as unscathed as CE 399. Cunningham Deposition, at 35. Cunningham pointed out that a relatively heavy bullet with a slow muzzle velocity normally is less likely to fragment upon impact than lighter, faster slugs, and that the damage imputed to CE 399 and its outwardly pristine condition were not inconsistent. *Id.* at 36–37. Frazier, who with Cunningham and one other had performed the ballistics tests on assassination evidence, observed that CE 399 had flattened slightly during its journey and might have extruded a significant amount of lead, in the form of fragments, from its base. Frazier Deposition, at 26–27, 32, 38–39.

The remainder of plaintiff's assertions regarding CE 399 concern tests he claims ought to have been performed, such as comparison of CE 399 with core fragments. Weisberg Affidavit, at 15, 16. Gallagher indicated that he indeed had made such comparisons, but that aside from the spectrographic worksheets which formed the basis of Frazier's November 23, 1963 report, he prepared no reports on the comparison under spectrography or neutron activation analysis. Gallagher Deposition, at 26, 73–74. Gallagher indicated also that a directive to preserve CE 399 "for posterity" precluded his testing different portions of the bullet for composition, *id.* at 57, though he ran multiple tests on the samples he was permitted to remove. *Id.* at 59–60. Apart from plaintiff's allegations, there is nothing to suggest that any comparative test reports, by spectrographic and neutron activation techniques, were prepared other than those furnished to plaintiff. That such tests should have been made is not relevant, even if true.

The first report disseminated by the FBI laboratory took the form of a letter dated November 23, 1963, to Dallas Police Chief Jesse Curry. Gallagher Exh. 5. Portions of this letter indicate that CE 399 [referred to in the letter as Q1] was fired from the Mannlicher-Carcano rifle, and that the windshield scrapings as well as certain bul-

let fragments were determined to be similar in composition to CE 399. Gallagher Exh. 5, at 2. In the course of his testimony before the Commission, Frazier was questioned about a "comparison made of the lead residues on the inside of the windshield with . . . the bullet fragments . ." Frazier indicated he had prepared "the formal report of the entire examination" based on the report Gallagher·had submitted. Plaintiff claims not to have received either the "formal report" or the "report" prepared by Gallagher. Opposition, at 11. The confusion as to the latter appears to have stemmed from differences in terminology: what Frazier called a report consisted of Gallagher's worksheets. Gallagher Deposition, at 84. As to the "formal report," plaintiff argues that the November 23 letter could not possibly cover "the entire examination" because much testing, particularly the neutron activation analysis, did not transpire until months after the letter was written. Opposition, at 11. Frazier and Gallagher, on the other hand, indicate that the November 23 letter was the "formal report" Frazier alluded to in his Commission testimony. Frazier Deposition, at 41; Gallagher Deposition, at 86. Here, too, the evidence is uniformly against plaintiff's assertion. Frazier's reference to "the formal report of the entire examination" plainly relates to the procedures about which he was just queried: the comparison of the windshield residues with CE 399 and bullet fragments. Plaintiff's assumption that the "formal report" covers the entire investigation rather than one of the numerous examinations which comprised the investigation is wholly unwarranted: There is no evidence to controvert Frazier's and Gallagher's statements that the November 23 letter was, in fact, the "formal report" described by Frazier before the Commission.

Plaintiff also contends that neither CE 399 nor any bullet fragment was tested for human residue. Weisberg·Affidavit, at 14. Because this allegation does not concern the existence of unfurnished reports but rather the appropriateness of such tests, such contention need not be considered except to note that the depositions yield no indication that such testing ever occurred. Cunningham Deposition, at 22–23; Gallagher Deposition, at 39, 48.

Plaintiff asserts he received no report on "the analysis of the copper-jacket material." Weisberg Affidavit, at 15. Gallagher indicated that laboratory practice was not to test copper jackets spectrographically unless such testing would contribute to the investigation. Gallagher Deposition, at 13. Copper's tendency to overshadow other elements under neutron activation analysis precluded testing of that kind. *Id.* at 74–75. Nothing in the record indicates reports or other materials in this area have not been furnished.

*Q8: The Live Round.* Plaintiff claims repeatedly not to have received reports on Q8, the live round discovered in the chamber of the Mannlicher-Carcano rifle. Opposition, at 10; Weisberg Affidavit, at 16, 57. Gallagher was unaware whether the round had been tested, and indicated that it probably should have been tested. Gallagher Deposition, at 43–46. Defendant Department of Justice has indicated that Q8 was subjected to "Firearms Identification" testing·only. Defendant United States Department of Justice's Answers to Plaintiff's First Set of Interrogatories, at 4. Inexplicably, however, plaintiff directed questions about Q8 only to Gallagher, who was unfamiliar with testing in the firearms identification category, and not to Frazier or Cunningham, both of whom conducted firearms identification tests. Though what either of the latter might have said about Q8 is open to speculation, the November 23, 1963 report to Chief Curry describes Q8 only as being of the same manufacture as certain cartridges found on the scene in the school book depository building. The inference to be drawn, uncontroverted by any other evidence, is that Q8 was subjected to visual scrutiny only by one of the ballistics examiners, and thus that no reports or other material on Q8 remain to be furnished. It

is worth noting parenthetically that the plaintiff does not indicate, and the Court does not discern what purpose additional testing of Q8 would have served. In that respect, Gallagher's supposition—that no further testing of Q8 was necessary because it was sufficient that the live round was of the same manufacture as the cartridges—seems eminently reasonable. Gallagher Deposition, at 46–47, 68–69. There is no evidence to suggest that reports or other materials on Q8 have not been supplied.

*Testing of Clothing.* Taken together, the Weisberg affidavit and plaintiff's Opposition to the motion for summary judgment reveal only one point of dispute: whether a report exists comparing the two anterior holes in CE 394, the shirt worn by President Kennedy on November 22, 1963. Opposition, at 10; Weisberg Affidavit, at 24–25. As to the remaining tests performed on items of clothing (the President's, Governor Connally's, and Oswald's), the record indicates that spectrographic testing only was performed on these items, and that neutron activation analysis was not performed because laboratory personnel did not deem it an appropriate technique for those items. Defendant United States Department of Justice's Answers to Plaintiff's First Set of Interrogatories, at 12–13; Gallagher Deposition, at 50–52. The worksheets reflecting examination of both the President's and Governor Connally's clothing have been provided to plaintiff, together with the FBI's reports, internal and external, on the examinations. *E. g.,* Letter from J. Edgar Hoover to J. Lee Rankin (March 23, 1964); Memorandum from R. H. Jevons to Mr. Conrad (April 15, 1964).

The sole basis for plaintiff's assertion that an extant report on the comparison of CE 394 holes remains to be furnished is that former Special Agent Frazier testified in the course of his deposition that he had asked another examiner to determine, by buttoning the shirt, whether the two anterior holes overlap. Frazier Deposition, at 60–62. Initially, Frazier could not recall whether he himself had conducted that aspect of the examination of the shirt, *id.* at 61, and he subsequently indicated that another examiner, whom he thought was Paul M. Stombaugh, had made the examination, and prepared a report on his conclusions. *Id.* at 62. Frazier assumed that the Commission had obtained a copy of the report in the course of taking Stombaugh's testimony. *Id.* There is no indication outside Frazier's deposition testimony that Stombaugh, or any examiner other than Frazier, prepared such a report. CE 394 was discussed only twice in the course of the Commission hearings, by Cmdr. James J. Humes, a pathologist at the Naval Medical Center who testified on the autopsy conducted on the body of the President,[5] and by Frazier himself. Frazier stated first that he himself had conducted the examination of the President's shirt. V *Hearings Before the President's Comm'n on the Assassination of President Kennedy* 60 (1964). He stated that "on the front of the shirt, I found what amounts to one hole. Actually, it is a hole through both the button line of the shirt and the buttonhole line which overlap down the front of the shirt when it is buttoned." *Id.* Frazier's testimony before the Commission compels the conclusion that he was mistaken in attributing responsibility for the examination of the two anterior holes to another examiner. One explanation for his error, aside from the lapse of more than thirteen years since the examination in question, is that Special Agent Stombaugh indeed examined the fibers of a shirt linked with the assassination, and testified before the Commission on the results of his examination; the shirt in question, however, was

---

5. Commander Humes indicated that "with the shirt buttoned, the fly front of the shirt causes two layers of cloth to be present in this location, and that [sic] there is a defect in the inner layer of cloth and a corresponding defect in the outer layer of the cloth." II *Hearings Before* the President's Comm'n on the Assassination of President Kennedy 365 (1964). He said also that "the defects in 393 [the President's suitcoat] and 394 [the shirt] coincide virtually exactly with one another." *Id.* at 366.

CE 150, that worn by Lee Harvey Oswald at the point he was captured by police. IV *Hearings, supra,* at 74–75. There being no genuine question as to the existence of the report alluded to by Frazier in his deposition, this point, too, must be resolved against the plaintiff.

*Neutron Activation Testing of Fragments and Residue.* Plaintiff claims not to have received extant reports on the neutron activation analysis of Q3, a fragment recovered from beside the right front seat of the Presidential limousine, and Q15, residues obtained by scraping the inside of the limousine's windshield. Opposition, at 8–9; Weisberg Affidavit, at 13. The Department of Justice answers to plaintiff's interrogatories indicated that neither Q3 nor Q15 was subjected to neutron activation analysis. Defendant United States Department of Justice's Answers to Plaintiff's First Set of Interrogatories, at 12, 13. When former Special Agent Gallagher was queried about Q3, he initially could not recall testing it, but later, on his own initiative, he remembered subjecting the item to neutron activation analysis and emerging with no significant result. Gallagher Deposition, at 74–75, 90–92. The lack of results for Q3, a fragment consisting chiefly of copper jacket, is consistent with Gallagher's previous statement that copper is normally not susceptible to neutron activation analysis. *Id.* at 74. As to Q15, the windshield scraping, Gallagher stated, after initial inability to recall, that neutron activation analysis had, just as with Q3, not resulted in any significant finding, chiefly because the Q15 sample was inadequate. *Id.* at 71. In each case, Gallagher had left his worksheets virtually blank, accounting for the Depart-

ment's assumption in its answers to plaintiff's interrogatories that no neutron activation analysis on these items had been conducted. The record indicates conclusively that, despite its denial that such testing had occurred, the Government has unwittingly supplied the plaintiff with the very worksheets to indicate that such testing did occur, albeit unsuccessfully. As to the printouts from the testing, Gallagher indicated that the data on the printouts was duplicative of that on the worksheets, and hence that the printouts themselves might not have been kept. Gallagher Deposition, at 92, 117. The deposition testimony on the neutron activation analysis conducted on fragments does not indicate that tests were conducted for which materials have not been furnished.

*Dealey Plaza Curbstone.* Plaintiff claims that he was not supplied with materials relating to testing performed on a curbstone removed in 1964 from near the site of the assassination. Opposition, at 10; Weisberg Affidavit, at 10, 36–42.[6] According to bystanders at the assassination, there were indications that a bullet or bullet fragment had struck the curbstone during the moments of firing at the Presidential limousine. On July 7, 1964, the Warren Commission requested an examination of the curbstone, and early in August Special Agent Lyndal Shaneyfelt was dispatched to Dallas to retrieve it. The result of his analysis of the "smear" he discovered on the curbstone was that the foreign substances thereon "could be bullet metal." Shaneyfelt Exh. 2. The tests conducted on the curbstone were microscopic and spectrographic only; no neutron activation analysis was conducted. Gallagher Deposition, at 69–70. The deci-

---

**6.** It might be noted that plaintiff's allegations regarding the curbstone extend far beyond testing materials supposedly not furnished pursuant to his FOIA requests. His submissions include the affidavit of James T. Tague, a witness to the assassination apparently struck by unidentified debris associated, Tague contends, with the mark on the curbstone. Tague Affidavit, at 7. Much of the affidavits of both plaintiff Weisberg and Mr. Tague are directed toward establishing that the mark on the curb-

stone underwent drastic alteration, from a chip in 1963 to a smear in mid-1964, when the FBI recovered the curbstone. It is not clear from plaintiff's affidavit whether he is asserting that the FBI removed the wrong curbstone, or that the curbstone is the same, with only the mark different. *Compare* Weisberg Affidavit ¶ 185 *with id.* ¶ 194. In any case, none of the allegations on these points needs be considered in the context of plaintiff's FOIA requests, and the extent of Government compliance therewith.

sion not to subject the mark to neutron activation analysis explains the disparity between the two elements isolated in the "smear" and the nine isolated from bullet core fragments, and accounts also for the laboratory's reluctance to attribute the mark to a bullet. *See* Weisberg Affidavit, ¶ 33, at 10; Frazier Deposition, at 48; Shaneyfelt Exh. 2. As to microscopic examination, Frazier testified on deposition that he had scrutinized the curbstone mark under a microscope, and Shaneyfelt indicated that he might have done so in the course of conducting other tests on the mark. Frazier Deposition, at 51; Shaneyfelt Deposition, at 14. Frazier incorporated the results of his microscopic examination of the curbstone into a draft of a letter eventually sent August 12, 1964, by J. Edgar Hoover to Commission counsel Rankin. The spectrographic examination of the curbstone was conducted by Special Agent William R. Heilman, now retired. Memorandum from M. J. Stack, Jr. to Mr. Cochran (June 20, 1975). The spectrographic plate which reflects the single run to which Heilman subjected the curbstone has not been furnished to the plaintiff; Heilman believes it was discarded in the course of one of the laboratory's periodic housecleanings. *Id.* Shaneyfelt testified to not having seen any other reports on the curbstone besides those shown to him in the course of his deposition. Shaneyfelt Deposition, at 15. Taken together, these aspects of the record indicate uniformly that all available material on testing of the curbstone has been furnished to plaintiff.

## CONCLUSION

The foregoing analysis of the record has disposed of every contention and claim the Court has been able to elicit from plaintiff's various submissions. In many instances, there is direct testimony that a particular test was not performed; in others, testimony as to particular laboratory practices compels the conclusion that the test was not performed. For all its detail, the preceding analysis does not pretend to treat such aspects of plaintiff's argument as the alleged destruction of assassination evidence and falsification of test results. Neither topic is pertinent. The analysis likewise has not dealt extensively with plaintiff's allegations and suggestions, sounding of conspiracy, that reports and materials have been stolen or deliberately mislaid, and that Government witnesses have lied under oath; apart from these allegations, there is not an iota of evidence to support either assertion.

A FOIA action demonstrably lacking in genuine issues of material fact is appropriately resolved by summary judgment. *See Nolen v. Rumsfeld,* 535 F.2d 890, 891 (5th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 555 (1977). This action lacks such issues. Although plaintiff has impugned defendants' affidavits on the ground that they do not specify the files searched in compliance with plaintiff's request, Opposition, at 12, the Government's response to a FOIA request need not be as specific as plaintiff would require, it being sufficient that the affiant has personal knowledged that all files which might contain requested material have been searched. *Exxon Corp. v. FTC,* 384 F.Supp. 755, 759–61 (D.D.C.1974), *remanded without opinion,* 174 U.S.App. D.C. 77, 527 F.2d 1386 (1976).

As in *Nolen, supra,* "[t]he Government has, in candor and in good faith before this Court, stated that all the records available have been made available to the plaintiff." 535 F.2d at 891. If plaintiff has any further recourse, it is not under FOIA. *See id.* Accordingly, defendants' motion for summary judgment must be granted.

An Order consistent with the foregoing has been entered this 4th day of October, 1977.