**Harold WEISBERG, Appellant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE et al.**

**No. 78–1107.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 20, 1979.

Decided April 28, 1980.

James H. Lesar, Washington, D. C., for appellant.

John H. Korns, II, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Michael W. Farrell and Michael J. Ryan, Asst. U. S. Attys., Washington, D. C., were on brief, for appellees.

Before BAZELON, Senior Circuit Judge, and ROBINSON, Circuit Judge, and VAN DUSEN,* United States Circuit Judge for the Third Circuit.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Harold Weisberg appears here for the third time in his decade-long crusade under the Freedom of Information Act (the Act)[1] for documents bearing on the assassination of President Kennedy.[2] The present appeal is from a summary judgment in the District Court holding that the Department of Justice has disclosed all available material within the scope of Weisberg's quest.[3] Our review of the record constrains us to conclude that the Department's demonstration on that score was inadequate for purposes of summary judgment. Accordingly, we reverse the judgment and remand the case for further proceedings.

## I

In 1970, Weisberg petitioned the Federal Bureau of Investigation (FBI) for release of spectrographic analyses of several items of Kennedy-assassination evidence.[4] The FBI denied his request, claiming that the analyses were protected from disclosure by Exemption 7 of the Act,[5] a provision shielding investigatory files compiled for law enforcement purposes.[6] In 1973, this court, sitting *en banc*, upheld that determination.[7] Following our decision, however, Congress amended the Act and narrowed the scope of Exemption 7.[8]

Weisberg then renewed his demands for investigatory data, directing them to both the FBI and the Atomic Energy Commission.[9] Although some documents were disclosed, Weisberg felt that the agencies had made an inadequate response, and attempted to establish through interrogatories that there were additional records not provided to him.[10] On the agencies' motion, the Dis-

---

\* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

1. 5 U.S.C. § 552 (1976).

2. Our previous decisions are *Weisberg v. Department of Justice (Weisberg I)*, 160 U.S.App. D.C. 71, 489 F.2d 1195 (*en banc* 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *Weisberg v. Department of Justice (Weisberg II)*, 177 U.S.App.D.C. 161, 543 F.2d 308 (1976).

3. *Weisberg v. Department of Justice*, 438 F.Supp. 492 (D.D.C.1977).

4. See *Weisberg I, supra* note 2, 160 U.S.App. D.C. at 72–73, 489 F.2d at 1196–1197.

5. 5 U.S.C. § 552(b)(7) (1976).

6. See *Weisberg I, supra* note 2, 160 U.S.App. D.C. at 72–73, 489 F.2d at 1196–1197.

7. *Id.* at 73, 489 F.2d at 1197.

8. Act of Nov. 21, 1974, Pub.L. No. 93–502, § 2, 88 Stat. 1563.

9. See *Weisberg II, supra* note 2, 177 U.S.App. D.C. at 162, 543 F.2d at 309. Weisberg asked both the FBI and the Atomic Energy Commission for copies of any tests performed on Kennedy-assassination evidence for the Warren Commission, including spectrographic and neutron activation analyses. Brief for Appellant at 22–24.

10. *Weisberg II, supra* note 2, 177 U.S.App.D.C. at 162, 543 F.2d at 309.

trict Court quashed the interrogatories as "oppressive," found that the agencies had "complied substantially" with Weisberg's requests, and dismissed his case as moot.[11] We reversed, however, finding material disputed facts regarding the existence of relevant but unreleased records, and holding that Weisberg was entitled to further discovery.[12]

In remanding for that purpose, we expressed the opinion that success in locating the desired data might be promoted if Weisberg sought testimony from those who conducted the scientific tests and generated the records, instead of questioning present custodians of the files.[13] Weisberg followed this suggestion and deposed four FBI agents who had personal knowledge of the tests performed.[14] He also resubmitted interrogatories and requests for production of documents to the FBI and the Energy Research and Development Administration (ERDA), the successor to the Atomic Energy Commission.[15] Weisberg then endeavored to depose FBI Special Agent John W. Kilty on the scope of the search that had been made of FBI files.[16] Kilty had earlier executed two affidavits avowing that the files contained no information of interest to Weisberg other than that already furnished him.[17]

The Department of Justice moved for a protective order to prevent the deposition, and to quash an accompanying subpoena, on the grounds that they would be unduly burdensome and would exceed the scope of our earlier remand, which the Department interpreted as confining discovery to testimony by those directly involved in creating the investigative records.[18] The District Court, persuaded that the deposition would impose "an unnecessary burden," granted the motion,[19] and, in a subsequent memorandum opinion, awarded the Department a summary judgment, holding that it had adequately demonstrated that all available documents within the purview of Weisberg's demands had been released, and thus had met its burden of showing that there remained no genuine issue of material fact.[20]

Weisberg now appeals this disposition, contending that summary judgment was improper because the depositions and the responses to his interrogatories identified documents not given to him, and the Department had not substantiated a file search of a caliber sufficient to assure retrieval of all existing data. After carefully reviewing the record before us, we find that there remains a genuine issue of material

11. See *id.* at 162–163, 543 F.2d at 309–310.

12. *Id.* at 164, 543 F.2d at 311.

13. *Id.* In venturing this suggestion, however, we did not intend to foreclose Weisberg from directing discovery to individuals who did not personally participate in the investigation, nor, contrary to the Government's view, see Brief for Appellee at 5, do we perceive any such barrier in our opinion. The issue was whether all documents available to Weisberg had been produced, and we remanded for further proceedings to settle that question, without limiting the nature of those proceedings. *Weisberg II, supra* note 2, 177 U.S.App.D.C. at 164, 543 F.2d at 311.

14. The deponents were Robert A. Frazier, who was employed as a special agent in the laboratory's firearms and toolmarks unit during the investigation of the assassination; Cortlandt Cunningham, who was a supervisor in and presently is chief of that unit; John F. Gallagher, who was assigned to the spectrographic unit and who conducted spectrographic and neutron activation analyses; and Lyndal L. Shaneyfelt, who was assigned as a documents examiner and photograph specialist. See Joint Appendix (J.App.) 438, 520, 581, 720; *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 494, 499.

15. Brief for Appellant at 26.

16. See Plaintiff's Notice to Take Depositions, Apr. 19, 1977, Record on Appeal (R.) 37.

17. See Affidavit of John W. Kilty (May 13, 1975), J.App. 53–54; Affidavit of John W. Kilty (June 23, 1975), J.App. 59.

18. Brief for Appellee at 5. We disagree with the Department's description of the scope of our remand. See note 13 *supra.*

19. R. (following item 38) (order of Apr. 25, 1977).

20. *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 504.

fact as to whether all extant documents encompassed by Weisberg's request have been located.[21]

## II

Only recently we summarized the principles governing the propriety of granting summary judgment on a claim that an agency has fully discharged the disclosure responsibility imposed by the Act. We said:[22]

> It is well settled in Freedom of Information Act cases as in any others that "[s]ummary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law."[23] It is equally settled in federal procedural law that

>> [t]he party seeking summary judgment has the burden of showing there is no genuine issue of material fact, even on issues where the other party would have the burden of proof at trial, and even if the opponent presents no conflicting evidentiary matter. "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."[24]

So, to prevail in a Freedom of Information Act suit, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements."[25]

The Department of Justice relies entirely on a claim of complete disclosure. Thus, to prevail, it must demonstrate that there was no genuine issue respecting its assertion that all requested documents in its possession had been both unearthed and unmasked. In an effort to do so, the Department first contends that Agent Kilty's affidavits made a prima facie showing that the file search was thorough enough to uncover any data meeting Weisberg's specifications.[26] The Department further asserts that Weisberg failed to rebut this preliminary showing because the evidence adduced during discovery did not identify anything responsive to his request that has not now been disclosed.[27] When, however, the evidence is viewed in the light most favorable to Weisberg—as indubitably it must be [28] —we find that solicited but unproduced ma-

---

**21.** Although Weisberg initially requested documents from both the FBI and the Atomic Energy Commission (later ERDA), see notes 9, 15 *supra* and accompanying text, he subsequently focused exclusively on the file search by the FBI, see notes 16–20 *supra* and accompanying text. His claims thus are now apparently limited to materials in the custody of this agency. See *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 493 n.1.

**22.** *Founding Church of Scientology v. NSA,* 197 U.S.App.D.C. 305, 317, 610 F.2d 824, 836 (1979).

**23.** Quoting (with footnotes omitted) *National Cable Television Ass'n v. FCC,* 156 U.S.App.D.C. 91, 94, 479 F.2d 183, 186 (1973).

**24.** Quoting (with footnotes omitted) *United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 48, 518 F.2d 420, 441 (1975) (quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962)), and citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142, 155–156 (1970); *Bouchard v. Washington,*

168 U.S.App.D.C. 402, 405, 514 F.2d 824, 827 (1975); *Bloomgarden v. Coyer,* 156 U.S.App. D.C. 109, 114–116, 479 F.2d 201, 206–208 (1973); *Nyhus v. Travel Management Corp.,* 151 U.S.App.D.C. 269, 281, 466 F.2d 440, 442 (1972).

**25.** Quoting (with footnotes omitted) *National Cable Television Ass'n v. FCC, supra* note 23, 156 U.S.App.D.C. at 94, 479 F.2d at 186.

**26.** Brief for Appellee at 16.

**27.** Brief for Appellee at 19–24.

**28.** In ruling on a motion for summary judgment, factual matters are to be viewed in the light most favorable to the party opposing the motion. *Adickes v. S. H. Kress & Co., supra* note 24, 398 U.S. at 160, 90 S.Ct. at 1609–1610, 26 L.Ed.2d at 155–156; *Founding Church of Scientology v. NSA, supra* note 22, 197 U.S. App.D.C. at 317, 610 F.2d at 836; *United States v. General Motors Corp., supra* note 24, 171 U.S.App.D.C. at 48, 518 F.2d at 441. See also text *supra* at notes 22–25.

terial may still be in FBI files.[29] As the record presently stands, the FBI's affirmations on the quality of the search do not eliminate that possibility.[30]

■ Among the items identified through discovery was a spectrographic plate made during testing of a lead smear from the Dealey Plaza curbstone to determine whether it was caused by a bullet involved in the assassination.[31] The Department does not deny that this plate once existed; instead, in attempted explanation of the FBI's failure to produce the plate, the Department points to a statement by FBI Special Agent William R. Heilman that he believed the plate was discarded in one of the periodic housecleanings by the laboratory.[32] True it is that this morsel of evidence could lead to the conclusion, reached by the District Court, that the spectrographic plate is no longer in the FBI's possession.[33] But Heilman asserts no personal knowledge that the plate really was discarded, so another permissible inference is that Heilman is incorrect in his belief and that the plate remains somewhere in the FBI's domain. A factual question thus persists, and it was inappropriate for the District Court to undertake to resolve it at the stage of summary judgment.[34]

The deposition of FBI Special Agent John F. Gallagher indicated that neutron activation analysis (NAA) was conducted on specimen Q3, a bullet fragment found on the right front seat of the presidential limousine, and on specimen Q15, residues collected by scraping the vehicle's windshield.[35] Weisberg claimed that the computer printouts containing the raw data from the NAA testings have been withheld. Agent Gallagher testified responsively that these data sheets may not have been kept because they were duplicative of information recorded on worksheets at the time of the testing,[36] copies of which have been provided to Weisberg.[37] Again, although the District Court took this evidence as sufficient to demonstrate that the printouts were no longer available,[38] that result was not compelled. Viewing the evidence in the light most favorable to Weisberg, one might easily infer that the printouts were not discarded and are still in the FBI's possession.

FBI Special Agent Robert A. Frazier stated that he had asked another agent, possibly Paul Stombaugh, to conduct an examination of the shirt worn by the President to determine whether two holes in the collar overlapped—a question bearing on whether both holes were made by a single bullet.[39] After comparing this with Frazier's contradictory testimony before the Warren Commission, the District Court concluded that Frazier examined the shirt himself, and therefore that Stombaugh had not made any such examination at all.[40] The court's deduction was hardly illogical but, more to the point, was not inexorably required; while Frazier's Warren Commission testimony may have been the correct ver-

---

29. See notes 31–42 *infra* and accompanying text.

30. See notes 43–51 *infra* and accompanying text.

31. Memorandum from M. J. Stack, Jr., to one Cochran (June 16, 1975), J.App. 191.

32. The statement apparently was reported in a memorandum from M. J. Stack, Jr., to Mr. Cochran on June 20, 1975. See *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 504.

33. *Id.*

34. See cases cited *supra* notes 22–24.

35. J.App. 652, 671–673.

36. J.App. 673:

Q: [Mr. Lesar] There would have been print-out on it [NAA testing of Q3 and Q15], wouldn't there?
A: Probably.
Q: On each of these specimens, would there not.
A: Probably yes, unless they were judged to be worthless and not kept.

37. *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 503.

38. *Id.*

39. J.App. 498–502.

40. *Weisberg v. Department of Justice, supra* note 3, 438 F.Supp. at 502–503.

sion, from aught that appeared his deposition statements could have been more accurate. Weisberg, we repeat, should have been the beneficiary of the inference more favorable to him—that Stombaugh did make the examination and his report is somewhere in FBI files.

Thus, accepting the indications most favorable to Weisberg, at least these three documents should have turned up during the search of FBI files.[41] Since the Department did not show positively that the primary facts are not susceptible to this interpretation, it was not entitled to summary judgment.[42] The Department asserts, however, that even if the record did not establish that all once-existing records had either been produced or discarded, the affidavit of Agent Kilty adequately demonstrated the thoroughness of the FBI file search and negated any inference that other requested documents still remained in the files.[43]

We have heretofore taken pains to define the role of affidavits in situations of this sort:[44]

[O]f course, in adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits, for

these "are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that identified documents are exempt."[45] To justify that degree of confidence, however, supporting affidavits must be "'relatively detailed' and nonconclusory and must be submitted in good faith."[46] Even if these conditions are met the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order.

Kilty's affidavit states only that:

I have conducted a review of FBI files which would contain information that Mr. Weisberg has requested. . . . The FBI files to the best of my knowledge do not include any information requested by Mr. Weisberg other than the information made available to him.[47]

Even if, as the Department argues, this is to be read as an indication of a review of *all* FBI files potentially containing information Weisberg demanded,[48] the affidavit gives no detail as to the scope of the examination and thus is insufficient as a matter of law to establish its completeness.[49] This is par-

41. We do not mean to suggest that, aside from these three documents, there were no others with respect to which summary judgment was inappropriate. Our remand leaves it to the District Court in the first instance to review the record and determine whether the Department has met the burden we have described.

42. *E. g., Adickes v. S. H. Kress & Co., supra* note 24, 398 U.S. at 160 & n.22, 90 S.Ct. at 1609–1610 & n.22, 26 L.Ed.2d at 155–156 & n.22.

43. Brief for Appellee at 16–17.

44. *Founding Church of Scientology v. NSA, supra* note 22, 197 U.S.App.D.C. at 317, 610 F.2d at 836.

45. Quoting *Goland v. CIA,* 197 U.S.App.D.C. 25, 38, 607 F.2d 339, 352 (1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

46. Quoting (with footnotes omitted) *id.,* in turn quoting *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 346, 484 F.2d 820, 826 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

47. *Affidavit of John W. Kilty* (May 13, 1975), J.App. 53–54. Agent Kilty executed a second affidavit on June 23, 1975, responding to Weisberg's allegations that he had not received documents to which he was entitled, in which Kilty made an almost identical statement about the search. J.App. 59.

48. Brief for Appellee at 16–17.

49. In *Goland v. CIA, supra* note 45, we agreed that the agency's affidavits portrayed well enough the completeness of the search. There, however, the affidavits, in our words, showed that an "'exhaustive search'" had been made, 197 U.S.App.D.C. at 39, 607 F.2d at 353, and gave "detailed descriptions of the searches undertaken, and a detailed explanation of why further searches would be unreasonably burdensome." *Id.* Similarly, in *Exxon Corp. v. FTC,* 466 F.Supp. 1088 (D.D.C.1978), the court found the search adequate, but there too an affidavit executed by the Secretary of the Federal Trade Commission explained in reasonable detail the breadth and methodology of the search, including a description of offices and bureaus that were contacted. *Id.* at 1093–1094.

ticularly so in view of the inferences, arising from the other evidence,[50] that some documents once existing may not have been discarded and thus remain in the files.

█ Unlike earlier cases in which summary judgment was predicated in part on a finding that the document search was complete,[51] the agency affidavits now before us do not denote which files were searched or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable Weisberg to challenge the procedures utilized. Under these circumstances, issues genuinely existed as to the thoroughness of the FBI search, and consequently summary judgment was improper. Moreover, since resolution of these disputes was essential to disposition of Weisberg's several claims, the District Court should have permitted him to depose at least Agent Kilty and perhaps others who examined the files. Courts have ample authority to protect agencies from oppressive discovery—for example, by limit-

ing the scope of permissible questioning[52] —and surely they need not sanction depositions down to the level of each individual participating in the search.[53] But the court becomes unduly restrictive when it bans further investigation while the adequacy of the search remains in doubt.[54]

The judgment appealed from is reversed, and the case is remanded to the District Court to enable further proceedings consistent with this opinion.

*Reversed and remanded.*

---

See also *Association of Nat'l Advertisers v. FTC,* 1976–1 Trade Cas., ¶ 60,835 (D.D.C.1976); *Bodner v. FTC,* 1974–2 Trade Cas., ¶ 75,329 (D.D.C.1974). In contrast, the Department of Justice has submitted nothing that informs us of the manner in which the file search for Weisberg was conducted; Kilty's affidavit merely states the fact that he searched and expresses his conclusion that the files contain nothing else sought by Weisberg.

It is worth noting that, despite the indicia of search thoroughness in *Goland v. CIA* described above, the CIA subsequently came across hundreds of additional papers encompassed by Goland's original request. 197 U.S.App.D.C. at 53, 607 F.2d at 367 (opinion on denial of rehearing). Although this somewhat accidental strike did not detract from the *bona fides* of the affiants, and was insufficient to warrant relief from the judgment we had already pronounced, *id.* at 55–58, 607 F.2d at 369–372, it serves to highlight the importance of requiring more detailed descriptions of the document search than were offered here.

Perhaps nowhere should that be accorded greater emphasis than here. Weisberg has proffered to us documents released after the District Court's grant of summary judgment that avowedly "directly contradict the Government's representation that the spectrographic plate of the curbstone 'smear' has been destroyed," see text *supra* at notes 31–34, and call into question the accuracy of the claim that the FBI's search was intensive. Appellant's Memorandum Regarding Order of the Court

(Mar. 13, 1979), at 6. Because we find the agency's affidavits inadequate without resort to this late-arriving information, we do not reach the question whether a remand or a supplementation of the record on appeal would otherwise be appropriate. With reversal of the summary judgment against Weisberg and remand of the case for further proceedings, the litigants on both sides will be free to introduce any additional evidence relevant to the character of the search in issue.

50. See text supra at notes 31–41.

51. See cases cited *supra* note 49.

52. See Fed.R.Civ.P. 26(c), 30(d).

53. *Association of Nat'l Advertisers v. FTC, supra* note 49, 1976–1 Trade Cas., ¶ 60,835, at 68,644.

54. See *Founding Church of Scientology v. NSA, supra* note 22, 197 U.S.App.D.C. at 317, 610 F.2d at 836 ("[e]ven if [the agency affidavits are detailed and nonconclusory and are submitted in good faith,] the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order"); *Exxon Corp. v. FTC, supra* note 49, 466 F.Supp. at 1094 (court should not cut off discovery before record has been suitably developed).